## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES *ex rel.* INTEGRA RESEARCH GROUP LLC,<br><br>    Plaintiff,<br><br>v.<br><br>B.S.D. CAPITAL, INC., dba LENDISTRY,<br><br>    Defendant. | Civil Action No.<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## FALSE CLAIMS ACT COMPLAINT

### Introduction

1. Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, Integra Research Group LLC ("Relator") brings this action as a *qui tam* relator on behalf of the United States against B.S.D. Capital, Inc., dba Lendistry ("Lendistry"), a fintech lender that originated Paycheck Protection Program ("PPP") loans, to recover damages, penalties, attorneys' fees and costs, and other relief.

2. In response to the economic effects of the Covid-19 pandemic, Congress created the PPP and tasked the Small Business Administration ("SBA") with administering it. Under the PPP, more than $793 billion in forgivable loans were issued between April 2020 and May 2021. SBA did not process and approve PPP loans itself, but rather relied on private lenders to originate the loans. For each loan originated, SBA compensated the lender with a processing fee equal to a percentage of the loan amount.

3. In 2023, Relator's principal, Dr. John Griffin, and two of his colleagues at the University of Texas published a paper that used statistical analysis to show systemic

misrepresentations in PPP loan applications. *See* John Griffin, Samual Kruger, and Prateek Mahajan, *Did Fintech Lenders Facilitate PPP Fraud?*, Journal of Finance, 78(3) 1777-1827 (2023) ("PPP Paper"). The PPP Paper found that loans originated by Lendistry had the highest rate of fraud indicators among loans originated by the top 75 PPP lenders in terms of number of loans. This result prompted Relator to investigate Lendistry's conduct further.

4.     Building on the PPP Paper, Relator conducted a multifaceted investigation that included a revised statistical analysis of data available concerning PPP loans originated by Lendistry and other lenders, and interviews with former Lendistry employees. Relator's investigation found that Lendistry violated PPP lender requirements by (a) failing to confirm the receipt of borrower certifications contained in PPP applications, (b) failing to confirm the receipt of information demonstrating that borrowers had employees for whom the borrowers paid salaries and payroll taxes, (c) failing to review payroll documentation to confirm the dollar amounts of borrowers' average monthly payroll costs for the preceding calendar year, and (d) failing to establish procedures to comply with the Bank Secrecy Act. As a result of these failings, Lendistry submitted, or caused to be submitted, false claims in the form of forgivable PPP loan applications and processing fee requests by falsely certifying that Lendistry had (a) "complied with the applicable lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule" (which states lenders shall (i) confirm the receipt of borrower certifications, (ii) confirm receipt of information demonstrating a borrower had employees for whom it paid salaries, and (iii) confirm the dollar amount of average monthly payroll costs)), and (b) obtained and reviewed the required loan applications, including documents demonstrating qualifying payroll amounts.

5.      Based on Relator's revised statistical analysis, Relator alleges, on information and belief, that over 63,000 of the PPP loans that Lendistry originated, or over 30.7 percent of all the PPP loans that Lendistry originated, were fraudulent. From these loans, borrowers received approximately $1.3 billion, of which SBA forgave approximately $852 million. Meanwhile, Lendistry obtained over $159 million in processing fees from SBA on these loans.

6.      Corroborating its statistical analysis, Relator's qualitative investigation found that Lendistry, which originated almost all of its PPP loans in just one month, May 2021, (1) had a practice of hiring underwriters who lacked qualifications to evaluate PPP loan applications, and (2) maintained a high pressure, chaotic work environment which did not prioritize document verification or fraud prevention. Based on a review of a sample of resumes for underwriters employed by Lendistry during the period when it was issuing PPP loans, only 27 percent of Lendistry's underwriters had any previous underwriting experience, only 37 percent had a degree in finance, economics, or accounting, and 10 percent had no bachelor's degree at all. One California-based underwriter reported to Relator they were paid only $17 per hour, less than half of the average underwriter wage in California. Furthermore, Relator's interviews of numerous former Lendistry employees showed that Lendistry managers pressured staff to approve loans without verifying supporting documentation or taking other steps to prevent fraud. Among other things, former employees reported that the company's payroll verification process often did not confirm the payroll of borrowers in accordance with SBA requirements for PPP lenders. According to one former Lendistry employee who was responsible for collecting and verifying the accuracy of supporting loan documents, "at one point, they didn't have to have any payroll amounts in the bank statements they sent us... I could approve [loans] even if there was no

3

evidence of payroll." Another employee reported that "an excel spreadsheet would suffice" as an acceptable "form of salary verification."

7.      Lendistry's lax processes violated PPP lender requirements and enabled borrowers to obtain loans in amounts for which the borrowers were not eligible. Relator's data analysis shows that Lendistry loan amounts were systemically inflated. Specifically, Relator's analysis flagged nearly 75 percent of Lendistry's PPP loans for high implied compensation – *i.e.*, per-employee compensation, as derived from loan amount and reported number of employees, that was significantly higher than the average per-employee compensation in the borrower's industry and region – in comparison to only 9 percent of traditional lender loans. Relator also found that Lendistry gave a high rate of loans to entities that also likely defrauded the Economic Injury Disaster Loan ("EIDL") program.

8.      Relator is an original source of the complaint allegations.

9.      Prior to the filing of this Complaint, Relator made substantive disclosures to the government of facts and evidence underlying the allegations in this Complaint, in accordance with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

10.     This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

### Jurisdiction and Venue

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

12.     This Court may exercise personal jurisdiction over Lendistry, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because, as a

4

result of Lendistry originating PPP loans to borrowers in this District, Lendistry transacted business in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

### The Parties

13.    Relator is a Texas limited liability company with its principal place of business in Austin, Texas. Relator specializes in using statistical analysis to uncover and prove fraud.

14.    Defendant B.S.D. Capital, Inc., dba Lendistry, is a Delaware corporation with a principal place of business at 767 S. Alameda Street, Suite 340, Los Angeles, California 90021. Lendistry issued over 207,000 PPP loans in an aggregate amount of over $4.7 billion. In terms of loans issued, Lendistry ranked 11th among all PPP lenders.

### Legal Background

**A.    The False Claims Act**

15.    The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

16.    For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' . . . mean that a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

**B.    The CARES Act and the PPP**

17.    Congress created the PPP under section 7(a) of the Small Business Act as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136 (Mar. 27, 2020). The PPP, which SBA administered, provided emergency relief to small and medium-sized businesses affected by the COVID-19 pandemic. *See* 15 U.S.C. § 636(a)(36). The program initially provided $349 billion of forgivable loans. When the program ended, it had issued over $763 billion in forgivable loans.

18.    Under the first round of the PPP, an eligible business could apply for a loan of up to 2.5 times its average monthly payroll in 2019 subject to a maximum amount of $10 million. *See* 15 U.S.C. § 636(a)(36)(E). In December 2020, Congress enacted the Economic Aid to Hard Hit Small Businesses, Nonprofits, and Venues Act, Pub. Law 116-260, Div. N, Tit. III, which, among other things, provided for eligible small businesses to obtain a second round PPP loan. An eligible business could apply for a second round PPP loan of up to 2.5 times its average monthly payroll during 2019 or 2020, subject to a maximum amount of $2 million. 15 U.S.C. § 636(a)(37)(C). The PPP required that borrowers ignore annual salary amounts in excess of $100,000 when calculating average monthly payroll. *See* 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb).

19.    The PPP also provided for full forgiveness of a loan so long as the borrower used the loan proceeds in accordance with the PPP rules and did not reduce the number of its employees. *See* 15 U.S.C. § 636m. To the extent a borrower reduced the average number of its employees in the months after receiving the loan, the PPP provided a formula for reducing the loan forgiveness amount accordingly. *See* 15 U.S.C. § 636m(d)(2).

## C.    Applicable PPP Lender Requirements

20.    Under the PPP, SBA did not make PPP loans directly. Rather, the CARES Act provided for private lenders, such as Lendistry, to make PPP loans pursuant to PPP requirements. *See* 15 U.S.C. § 636(a)(36)(F)(ii-iii). SBA then guaranteed those loans. *See* 15 U.S.C. § 636(a)(36)(B). To participate in the PPP program, a lender must either have been an approved SBA 7(a) lender or have filed an SBA Form 3507 for approval. *See* 15 U.S.C. § 636(a)(36)(F)(ii-iii). Lendistry was already an approved SBA 7(a) lender when the pandemic began, making it eligible to process and approve PPP loans.

21.    The PPP required lenders to: (a) "[c]onfirm receipt of borrower certifications," (b) "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," and (c) "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). SBA advised that "[l]enders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost." SBA PPP FAQ #1 (Apr. 3, 2020). In particular, the CARES Act required that, "[i]n evaluating the eligibility of a borrower for a covered loan . . ., a lender shall consider whether the borrower . . . was in operation on February 15, 2020; and . . . had employees for whom the borrower paid salaries and payroll taxes; or . . . paid independent contractors, as reported on a Form 1099–MISC." 15 U.S.C. § 636(a)(36)(F)(ii)(II).

22.    As the PPP was established under section 7(a) of the Small Business Act, PPP lenders were required to conform with the overall requirements of the Act to the extent they did not conflict with PPP program requirements. *See* 85 Fed. Reg. at 20815.

7

23.     To obtain a loan guarantee from SBA for each processed and approved PPP loan, a lender would submit SBA Form 2484. In that form, the lender would certify that it had (a) "complied with the applicable lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule," and (b) "obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file." SBA Form 2484, Lender Application Form – Paycheck Protection Program Loan Guaranty (April 3, 2020). The "applicable lender obligations" required lenders to (i) "[c]onfirm receipt of borrower certifications contained in [the] Paycheck Protection Program Application form issued . . .," (ii) "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," (iii) "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application," and (iv) "[f]ollow applicable BSA requirements." 85 Fed. Reg. at 20815.

**D.      SBA Processing Fees**

24.     Under the PPP, SBA paid lenders a fee for processing and approving each loan. *See* 15 U.S.C. § 636(a)(36)(P). The fee was 5 percent for loan amounts up to $350,000, 3 percent for loan amounts between $350,000 and $2,000,000, and 1 percent for loan amounts greater than $2,000,000. *See id.* For loans of not more than $50,000, made on or after December 27, 2020, the SBA paid a processing fee equal to 50 percent of the loan value or $2,500, whichever was less. *See* SBA Procedural Notice, No. 5000-20091 (Feb. 8, 2021). To receive PPP processing fees, the PPP required lenders to submit SBA Form 1502. *See* 85 Fed. Reg. 26321, 26323 (May 4, 2020).

Form 1502 required a lender to confirm that "all the information" in each Form 1502 was "true and correct." SBA Procedural Notice, No. 5000-20028 (May 21, 2020).

### The PPP Paper

25.     In their 2023 PPP Paper, Dr. Griffin and his co-authors focused on four primary indicators of potentially fraudulent PPP loans: "[1] nonregistered businesses, [2] multiple loans at a residential address, [3] abnormally high implied compensation relative to industry by core-based statistical area (CBSA) averages, and [4] large inconsistencies (as large as 10-fold) between the jobs reported by borrowers on their PPP application and jobs reported to another contemporaneous government program application [e.g., EIDL] with a different incentive structure." PPP Paper at 1778.

26.     The PPP Paper found that, of the top 75 PPP lenders by number of loans issued, Lendistry had the greatest proportion of loans flagged with any of these four primary indicators of fraud. Specifically, the authors of the PPP Paper flagged over 33.8% of Lendistry-originated PPP loans with at least one of the fraud indicators.

27.     The PPP Paper also found that the four primary indicators were much more prevalent among loans issued by fintech lenders when compared to non-fintech lenders. *See id.* at 1778-79 ("FinTech loans are 3.23 times as likely to have at least one primary indicator of misreporting compared to traditional loans and 6.52 times as likely to have a primary indicator that is confirmed by an additional primary, secondary, or external indicator."). For this reason, Relator used non-fintech lenders (referred to herein as "traditional lenders") as a benchmark.

### Overview of Relator's Data Source and Statistical Analysis

28.     During the period from April 3, 2020, through June 30, 2021, 4,409 lenders issued over 11 million PPP loans in an aggregate amount of over $796 billion. For each of these loans,

the SBA PPP dataset includes information on, among other things, borrower name, address, jobs reported, industry, business type, loan amount, date of loan approval, and lender.

29.    To identify potentially fraudulent loans in the SBA PPP dataset, Relator slightly altered the analysis in the PPP Paper and focused on the following two below-described primary indicators, or "flags," of PPP loan fraud: (1) High Implied Compensation, and (2) EIDL > PPP Jobs.

30.    <u>High Implied Compensation Flag</u>. Because borrowers could receive loans for 2.5 times their average monthly payroll cost in 2019, and because the PPP dataset includes the loan amount and the number of employees reported by each borrower, Relator could estimate each borrower's per-employee compensation amount, or "implied average compensation," using the following formula:

$$Implied\ Average\ Compensation = \frac{12}{2.5} x \frac{Loan\ Amount}{Jobs\ Reported}$$

Using the United States Census Bureau's 2019 County Business Patterns data and Nonemployer Statistics, Relator then compared each borrower's implied average compensation against the average per-employee compensation for other businesses in the same industry (*i.e.*, same four-digit North American Industry Classification (NAICS) code) and same region (*i.e.*, same Core Based Statistical Area). In its analysis, Relator flagged loans where the borrower's implied average compensation was more than three times greater than the average per-employee compensation for other businesses in the same industry and region.

31.    <u>EIDL > PPP Jobs Flag</u>. Under the EIDL program in 2020, a business could obtain a forgivable advance of $1,000 per employee, up to a maximum of $10,000. Thus, for employers with less than 10 employees, there was an incentive to inflate the number of employees – up to a maximum of 10 – on their EIDL applications. By contrast, there was no incentive to inflate the

number of employees on a PPP loan application since PPP loan amounts were based on total payroll as opposed to the number of employees reported.

32.     For each borrower that obtained both a PPP loan and an EIDL advance, Relator used the PPP dataset and the EIDL dataset to compare the number of employees the borrower reported on its PPP loan application with the number of employees the borrower reported on its EIDL advance application. Because a discrepancy in the number of employees reported on a borrower's EIDL application and the same borrower's PPP loan application was a signal of unscrupulousness and willingness to defraud taxpayer funded programs, Relator flagged borrowers who reported at least three more employees on their EIDL applications than they reported on their PPP loan applications.

## Factual Allegations

**A.     Summary of Relator's Findings on Lendistry**

33.     As noted above, Relator found that one or both of its fraud indicator flags applied to over 63,000 PPP loans originated by Lendistry. On these loans, SBA paid out approximately $1.3 billion in loan proceeds to borrowers and approximately $159 million in processing fees to Lendistry. Table 1 shows a summary of Lendistry loans that Relator flagged.

**Table 1. Summary of Lendistry Loans Flagged ($ in Millions).**

| Suspicious Criteria | Count | Initial | Forgiven | Fees | Pct* |
|---|---|---|---|---|---|
| High Implied Compensation | 58,718 | $1,242 | $787 | $147 | 75% |
| EIDL > PPP Jobs | 8,306 | $169 | $117 | $21 | 42% |
| Any Flag | 63,576** | $1,335 | $852 | $159 | 31% |

*As a percent of possible loans
** Because some loans had both tags, the total number of flagged loans is less than the sum of the numbers of loans with each flag

34. As Figure 1 below shows, Lendistry's 31 percent rate of flagged PPP loans puts it first among the top 75 PPP lenders, including among other PPP lenders that already have been the subject of public fraud investigations.

**Figure 1. Percentage of PPP Loans Flagged by Lender – Top 75 PPP Lenders**



## B.    High Implied Compensation

35. As Table 1 above shows, Relator flagged nearly 75 percent of Lendistry-originated loans for High Implied Compensation. As Figure 2 below shows, this was, far and away, the highest rate of flagging for High Implied Compensation among the top 75 PPP lenders, including Kabbage, which has admitted to having inflated its borrowers' compensation amounts on PPP loan applications.

**Figure 2. Percentage of Loans Flagged for High Implied Compensation, by Lender**



Meanwhile, Relator flagged just 8.6 percent of traditional lenders' PPP loans for High Implied Compensation.

36.     Given the prevalence of Lendistry loans to borrowers with High Implied Compensation relative to other businesses in the same industry and region, Relator alleges, on information and belief, that Lendistry did not have sufficient procedures in place to "confirm receipt of information demonstrating a borrower had employees for whom the borrower paid salaries" or to "confirm the dollar amount of average monthly payroll costs," as PPP rules required. *See* 85 Fed. Reg. at 20815.

37.     In notable contrast to borrowers who obtained PPP loans from Lendistry, PPP borrowers from traditional lenders had implied average compensation that closely matched the industry-region average compensation. Figure 3 below shows the distribution of the borrowers' implied average compensation minus that of the industry-region average for loans from

traditional lenders (blue) and Lendistry (red) to PPP borrowers where the industry-region

average compensation was at or below $33,333.[1]

**Figure 3. Implied Average Compensation Minus Industry-Region Average Compensation, Lendistry Loans vs Traditional Loans**



38.     As Figure 3 indicates, for PPP borrowers where the industry-region average

compensation was at or below $33,333, their implied average compensation tended to be very

close to the industry-region average if they obtained their loans from traditional lenders. By

contrast, approximately 71 percent of Lendistry-originated loans had implied average

compensation that was more than $60,000 higher than the average per-employee compensation

for the relevant industry and region. Given this pervasive deviation from the norm, Relator

---

[1] Because the PPP maximum average compensation was $100,000 and because Relator only flagged loans with implied average compensation that was at least three times the industry-region average, Relator did not flag any loans to borrowers where the industry-region average compensation was greater than $33,333.

alleges, on information and belief, that Lendistry knowingly failed to confirm borrower payroll information.

39.     Relator also determined that Lendistry commonly approved loans based on implied average compensation of near $100,000, the maximum allowed under the CARES Act. Figure 4 below shows that, for Lendistry-originated PPP loans to borrowers where the industry-region average compensation was at or below $33,333, approximately 64 percent of the borrowers had implied average compensation over $95,000, whereas only about 4 percent of the analogous borrowers who obtained PPP loans from traditional lenders had implied average compensation at that level.

**Figure 4. Distribution of PPP Borrowers' Implied Average Compensation, Lendistry vs. Traditional Lenders**



40.     Table 2 below provides examples of Lendistry-originated PPP loans where the borrowers had improbably high implied average compensation per employee given their industry and region.

**Table 2. Examples of Lendistry PPP Loans Flagged for High Implied Compensation ($ in Thousands)**

| Borrower | City | NAICS | Jobs | Loan Amount | Fee | Implied Average Comp. | Industry-Region Average Comp. |
|---|---|---|---|---|---|---|---|
| Stephen Wirtz | Worcester, MA | 485310 (Taxi and Ridesharing) | 1 | $20.8 | $2.5 | $100.0 | $22.8 |
| Donna Crittendon | Pittsfield, MA | 812112 (Beauty Salons) | 1 | $20.8 | $2.5 | $100.0 | $26.6 |
| Christian Edwards | Chicopee, MA | 812111 (Barber Shops) | 1 | $20.8 | $2.5 | $100.0 | $27.6 |
| Daviston Jackson | Dorchester, MA | 561720 (Janitorial Services) | 1 | $20.8 | $2.5 | $100.0 | $32.7 |
| Chassity Corbin | Dorchester Center, MA | 485410 (School and Employee Bus Transportation) | 1 | $20.8 | $2.5 | $100.0 | $31.3 |
| Juliana Rosado | Springfield, MA | 812113 (Nail Salons) | 1 | $20.8 | $2.5 | $100.0 | $27.6 |

41.    For non-profit entities that obtained PPP loans through Lendistry, Relator separately compared the employee compensation they reported on their Internal Revenue Service ("IRS") Forms 990 with their implied compensation from the PPP loan data. As Figure 5**Error! Reference source not found.** below shows, Relator found that 20.7% of Lendistry's PPP loans to non-profits were based on implied average compensation that was at least $2,500 per employee greater than the compensation the borrowers reported on their tax returns. By contrast, at traditional lenders, only 2.4% of PPP loans to non-profits were based on implied average

compensation that was at least $2,500 per employee greater than the borrowers reported on their

tax returns.

**Figure 5. Non-Profit Borrowers' Implied Average Compensation Minus Form 990 Average Compensation, Lendistry vs Traditional Loans**



PPP Implied Average Compensation Minus Form 990 Average Compensation

42.    Furthermore, as Figure 6 below shows, this rate (*i.e.*, Lendistry's 20.7 percent rate

of PPP loans to non-profits with implied average compensation over $2,500 greater than their

Form 990 average compensation) is by far the highest among 75 PPP lenders.

**Figure 6. Percentage of PPP Loans to Non-Profits with an Implied Average Compensation Over $2,500 Greater Than the Borrower's Form 990 Average Compensation, by Lender – Top 75 PPP Lenders**



43.     Table 3 below lists examples of Lendistry PPP loans that Relator flagged for disparities between the total employee compensation that the non-profit borrowers reported to the IRS (*i.e.*, salaries, other compensation, and employee benefits (Form 990 Part I, line 15)) and the implied total compensation from their PPP loan applications.

**Table 3. Examples of Lendistry Loans to Non-Profits with Reported Compensation Disparities ($ in Thousands)**

| Borrower Name | Loan Approval Amount | Implied Total Compensation | Form 990 2019 Total Compensation | Form 990 2020 Total Compensation |
|---|---|---|---|---|
| Kimpatorin Aid Inc | $104 | $500 | $93 | $78 |
| Jewish Foundation of Ventura County | $149 | $715 | $363 | $341 |
| CSA Belvedere | $104 | $500 | $219 | $314 |
| Armenian National Committee | $21 | $100 | $13 | $13 |
| Wiseplace | $222 | $1,066 | $704 | $676 |
| Aramaic Broadcasting Network | $83 | $400 | $261 | $217 |

C.    **EIDL Jobs > PPP Jobs**

44.    As noted above, Relator applied the EIDL > PPP Jobs flag where borrowers claimed to have at least three more employees on their EIDL advance applications than they claimed on their PPP loan applications. Relator found that this flag applied to 8,306 PPP loans that Lendistry originated, or about 41% of the PPP loans that Lendistry originated for borrowers who also obtained EIDL advances. Given the prevalence of such loans by Lendistry, Relator alleges, on information and belief, that Lendistry did not have processes in place to appropriately "confirm receipt of borrower certifications" or to adequately follow Bank Secrecy Act requirements, as the PPP rules required. *See* 85 Fed. Reg. at 20815

45.    Figure 7 below shows that, of the Lendistry-originated loans that Relator flagged for EIDL > PPP Jobs, 53.1 percent also met the criteria for High Implied Compensation. Not surprisingly, as Figure 7 also shows, Relator found that the likelihood of both flags applying to a Lendistry-originated PPP loan increased as the disparity grew between the number of employees reported on the EIDL advance and PPP loan applications. For example, for PPP loans where a

19

borrower had reported having at least nine more employees on its EIDL advance application than on its PPP loan application, approximately 80 percent also had a flag for High Implied Compensation.

**Figure 7. Percentage of Loans Flagged for High Implied Compensation, by Difference Between Number of Employees Reported on EIDL Advance and PPP Loan Applications**



46.     Figure 8 below shows that, of borrowers who obtained PPP loans from Lendistry and who also obtained EIDL advances, over 30 percent reported having just one employee on their PPP applications and at least 10 employees on their EIDL advance applications. By contrast, at traditional lenders, the vast majority of borrowers with EIDL advances reported on their PPP applications that they had the same, or nearly the same, number of employees that they reported on their EIDL advance applications.

borrowers had reported having at least one more employee on its EIDL advance application than on a PPP loan application, approximately 60 percent also had a flag for high implied Compensation.

**Figure 7. Percentage of Loans Flagged for High Implied Compensation, by Difference Between Number of Employees Reported on EIDL Advance and PPP Loan Applications**

EIDL Jobs Minus [illegible] Jobs

56. Figure 8 below shows that of borrowers who obtained PPP loans from [illegible] and who also obtained EIDL advances, over [illegible] percent reported having just one employee on their PPP applications and at least 10 employees on their EIDL advance applications. By contrast, at traditional lenders, the vast majority of borrowers with EIDL advances reported on their PPP applications that they had the same, or nearly the same, number of employees that they reported on their EIDL advance applications.

**Figure 8. Comparison of Lendistry to Traditional Lenders – Distribution of Difference in Number of Employees Reported by Recipients of EIDL Advances and PPP Loans**



47.    In other words, as Figure 9 below shows, a large number of entities that likely defrauded EIDL by inflating their employee counts by nine or more also were able to get PPP loans from Lendistry, while far fewer of such entities obtained PPP loans from any single traditional lender.

21

**Figure 9. Comparison of Lendistry to Traditional Lenders – Number of PPP Loans to Borrowers that Reported at Least Nine More Employees on Their EIDL Advance Applications ("EIDL 10 PPP 1 Borrowers")**



48.    Lendistry's willingness to ignore indicators of fraud thus reveals itself in the stark contrast between Lendistry and traditional lenders in terms of their propensity to approve PPP loans to borrowers that likely also defrauded the EIDL program.

49.    Table 4**Error! Reference source not found.** below lists examples of Lendistry-originated PPP loans that Relator flagged because the borrower reported having at least four more employees on its EIDL advance application.

**Table 4. Examples of Lendistry PPP Loans Flagged for EIDL > PPP Jobs. ($ in Thousands)**

| Borrower Name | Borrower City | Approval Amount | Business Type | PPP Jobs Reported | EIDL Jobs Reported | EIDL Advance | Fee |
|---|---|---|---|---|---|---|---|
| Annie Lopes | Dorchester Center, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |
| Chrisla Gedeon | New Bedford, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |
| Edson Lestin | Everett, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |
| Stephen Towne | Mansfield, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |
| Carlos Terrero | Lunenburg, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |
| Steven Morillo | Lawrence, MA | $20.8 | Sole Proprietorship | 1 | 10 | $10 | $2.5 |

## D.    Other Problematic Loans

50.    In addition to the categories of likely fraudulent loans described above, Lendistry also approved many other loans that, on information and belief, Relator alleges to have been fraudulent. For example, as Table 5 below shows, on May 22 and 23, 2021, Lendistry approved 21 loans to borrowers that shared an address at 1317 Edgewater Drive, Orlando, Florida, where an entity called "PhysicalAddress.com" rents out addresses.

**Table 5. Examples of Lendistry Loans to Borrowers at One Address**

| Date Approved | Borrower Name | Approval Amount | Address | Type | NAICS | Fee |
|---|---|---|---|---|---|---|
| 5/22/2021 | Kyra Hollingsworth | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Kambrika Jennings | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Queen Somers | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Vanessa Daley | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Liberty Johnson | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Dan Buck | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Boris Thompson | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Venante Gabriel | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Djenau Beauplan | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Aissa Villamil | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541613 | $2,500 |
| 5/22/2021 | Booker O'Neal | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 531390 | $2,500 |
| 5/23/2021 | Ashley Mond | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 541430 | $2,500 |
| 5/22/2021 | Lourdes Denize | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 611710 | $2,500 |
| 5/22/2021 | Cadydra Wallace | $20,181 | 1317 Edgewater Dr | Sole Proprietorship | 611710 | $2,500 |
| 5/22/2021 | Raul Conteras | $20,181 | 1317 Edgewater Dr | Sole Proprietorship | 611710 | $2,500 |
| 5/22/2021 | Raph Curry | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812111 | $2,500 |
| 5/22/2021 | Vilbert Green | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812111 | $2,500 |
| 5/22/2021 | Joanna Barrington | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812112 | $2,500 |
| 5/22/2021 | Sharon Brown | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812112 | $2,500 |
| 5/22/2021 | Nadanja Godbee | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812113 | $2,500 |
| 5/22/2021 | Lebrisha Taffe | $20,833 | 1317 Edgewater Dr | Sole Proprietorship | 812113 | $2,500 |

51.    Table 6 below shows an example of five PPP loans that Lendistry issued to
borrowers who all shared the same residential address located at a three-bedroom house in
Sunland, California.

**Table 6. Examples of Lendistry-Originated PPP Loans to the Same Residential Address**

| Borrower Name | Approval Amount | Address | City | State | NAICS | Business Type |
|---|---|---|---|---|---|---|
| Avetis Markarian | $20,833 | 10311 Sherman Grove Ave | Sunland | CA | 722511 | Self-Employed |
| Siranush Melkonyan | $20,833 | 10311 Sherman Grove Ave | Sunland | CA | 722511 | Self-Employed |
| Nune Khachatryan | $20,833 | 10311 Sherman Grove Ave | Sunland | CA | 722511 | Self-Employed |
| Marina Markarian | $20,833 | 10311 Sherman Grove Ave | Sunland | CA | 722511 | Self-Employed |
| Michael Loukatos | $20,833 | 10311 Sherman Grove Ave | Sunland | CA | 722511 | Self-Employed |

52.    Similarly, Table 7 below shows an example of four PPP loans (each with an
implied average compensation of at least $100,000) that Lendistry issued to borrowers who
shared the same residential address at a house in East Patchogue, New York.

**Table 7. Examples of Lendistry-Originated PPP Loans to the Same Residential Address**

| Borrower Name | Approval Amount | Address | City | State | NAICS | Business Type |
|---|---|---|---|---|---|---|
| Guillaume Regis | $20,833 | 46 Corbin Ave | East Patchogue | NY | 485310 | Sole Proprietor |
| Stanley Regis | $20,833 | 46 Corbin Ave | East Patchogue | NY | 485310 | Independent Contactor |
| Lucknor Guilloutte | $20,833 | 46 Corbin Ave | East Patchogue | NY | 485310 | Sole Proprietor |
| Ashley Dianna Regis | $20,833 | 46 Corbin Ave | East Patchogue | NY | 453998 | Sole Proprietor |

E.    **Lendistry's Systemic Failure to Perform a Good Faith Review of PPP Loan Applications**

53.    Many former Lendistry employees reported to Relator that, during the short time Lendistry was processing PPP loans, it had poor documentation requirements, a chaotic work environment, quotas for loan approvals, and a lack of fraud prevention training.

54.    Table 8 below provides a sample of notable quotes from former Lendistry employees.

**Table 8. Lendistry Former Employee Interview Quotes**

| Employee | Title | Quote |
|---|---|---|
| A | Underwriter | "The applicants had to have a business bank account. That was one of the documents I had to approve. The policies changed frequently. At one point, they didn't have to have any payroll amounts in the bank statements they sent us. It could be blank and I could approve it." |
| A | Underwriter | "No payroll documents were required. When I was there, I didn't have to look at payroll. They were sole proprietors and used SSN as EIN. We didn't have to pay attention to payroll." |
| A | Underwriter | "No, we did do corporate loans as well but didn't focus on the payroll. Any income at all would suffice. I did work on corporate loans, but payroll was not required." |
| A | Underwriter | "Yes, I could approve it even if there was no evidence of payroll." |
| B | PPP Business Support | "It seemed a little suspect that an excel spreadsheet would suffice. They would accept this as a form of salary verification. I would just send it up to the next level and it would get accepted." |
| B | PPP Business Support | "A simple Excel spreadsheet with the payroll numbers was accepted. That seemed very odd to me." |
| B | PPP Business Support | "A list of employee names … who knows if they were family members or friends. I wasn't there to verify it, but just made sure it was submitted correctly. There seemed to be no way to verify if they have employees based on the documentation." |
| C | Business Sales Support Analyst, Loan Processor | "Pressure to push through loans, absolutely. They were adamant about the loans going through. You could pretty much tell everything they were doing was fraudulent. Apparently this one individual already had multiple loans. The reason it took so long is because the documents weren't correct. They made sure that loan went through." |
| C | Business Sales Support Analyst, Loan Processor | "You never knew what was going on and [there was] a lot of confusion." |
| C | Business Sales Support Analyst, Loan Processor | "Team leaders constantly changed, and it was really confusing. It got to the point where we were just winging it. Very confusing and frustrating." |
| C | Business Sales Support Analyst, Loan Processor | "Most of [the applicants] had bogus businesses. I know they had given out loans to people that didn't deserve it." |
| C | Business Sales Support Analyst, Loan Processor | "[I was] just collecting the documents, not verifying." |

| D | Business Support Underwriter, Closing Team | "There was a time frame for each loan – 15 minutes." |
|---|---|---|
| E | Closing Specialist | "I had a daily quota; it was 125 when I started. I was closing and just sent out the document to sign. I had to send out 125 DocuSigns per day. We didn't have time to verify everything." |
| E | Closing Specialist | "[They] just told me to make sure it gets closed by any means necessary." |
| E | Closing Specialist | "In terms of training, [I was] not trained to detect fraud." |
| E | Closing Specialist | "The leadership was disorganized and did not know what they were doing." |
| F | SBA Underwriter | "Professionalism was lacking." |
| F | SBA Underwriter | "When I was working there, I notified my supervisor of a lot of uncovered mistakes related to cash flow and SCR formulas (how company is doing)." |
| G | Business Development Specialist | "I definitely feel like [it] was kind of like the wild, wild, west." |
| G | Business Development Specialist | "Nonprofits were especially difficult for us. They had to have some certain revenue amount." |
| G | Business Development Specialist | "The file went to underwriter, and they used VeriFax. I think it is an IRS program that sent a transcript of the filed return." |
| G | Business Development Specialist | "The system would alert me if there was a duplicate. A little notification/banner at the top of the screen that would say it's a duplicate." |
| H | COVID Grant Underwriter | "By the time it got to us, we verified their address and Googled to see if that business was really there." |

55.     The experiences of former Lendistry employees are not surprising, given that Lendistry originated nearly 200,000 PPP loans in just the month of May 2021. As Figure 10 below shows, of the total of approximately 207,000 PPP loans that Lendistry originated, approximately 96 percent of those originations occurred in May 2021, the last month of the PPP. By comparison, traditional **Error! Reference source not found.**lenders originated only about 2 percent of their PPP loans in May 2021.

**Figure 10. Percentage of Loans Approved By Month, Lendistry vs Traditional Lenders**



56.    Relator also collected resumes of 69 individuals who worked at Lendistry during the time period when it was approving PPP loans. Table 9 below provides a summary of Lendistry employee titles and qualifications for these individuals.

**Table 9. Lendistry Resume Summary Stats**

| Employee Experience | Lendistry Title | | | |
|---|---|---|---|---|
| | All | Underwriters | Business Support | Title with "Senior" or "Lead" |
| All Employees | 69 | 30 | 15 | 9 |
| No Fin/Econ/Acct Degree | 23 | 19 | 7 | 1 |
| No Bachelor's Degree | 11 | 3 | 2 | 2 |
| No Underwriting Exp. | - | 22 | - | - |
| No Financial Industry Exp. | 45 | 11 | 13 | 2 |

Most notably, of the 30 individuals in this group who worked as Lendistry underwriters, 22, or 73 percent, had no prior experience in underwriting, and 19, or 63%, did not have a degree in finance, economics, or accounting.

57.    Table 10 below lists specific former Lendistry employees, including their jobs before and after working at Lendistry. By way of example:

- *Employee I* does not have a bachelor's degree and was employed by the Smithsonian Zoo and a wax museum before being hired as a loan processor by Lendistry. While at Lendistry, she "developed and implemented underwriting policies and procedures." After Lendistry, this individual worked as a security officer.

- *Employee II* worked in sales at Menchies Frozen Yogurt and James Avery Jewelry before being hired as a loan officer/underwriter at Lendistry to "analyze client credit data and financial statements" and "approve and close loan documents."

- *Employee III* does not have a college degree and worked as a cook and cashier at a Sonic restaurant and as an in-store shopper at an Albertsons supermarket before being hired by Lendistry to be an underwriter. According to her resume, while at Lendistry, she helped to "evaluate borrower creditworthiness by preparing thorough underwriting calculations and worksheets." Lendistry paid *Employee III* just $17 per hour for her role as an underwriter and loan officer. According to Indeed data for California as of May 31, 2024, the average underwriter hourly wage is $45.09 for an underwriter and $42.25 for a loan officer

29

**Table 10. Lendistry Resume Examples**

| Employee | Bachelor's Degree | Second Preceding Experience | | Preceding Experience | | Lendistry Experience | Subsequent Experience | |
|---|---|---|---|---|---|---|---|---|
| | | Employer | Title | Employer | Title | Title | Employer | Title |
| I | No | Smithsonian National Zoo | Retail Photo Associate | Madame Tussauds Wax Museum | Guest Experience Associate | Loan Processor | Signal 88 Security | Security Officer |
| II | | Menchies Frozen Yogurt | Sales | James Avery Jewelry | Sales | Loan Officer, Underwriter | Del Sol Medical Center | Registrar |
| III | No | Sonic | Cook/ Cashier | Albertsons | In-Store Shopper | Underwriter | - | - |
| IV | | Stifel Financial | Under-writer | Blooming-dale's | Sales Associate | Loan Specialist | BYN Melon | Data Analyst |
| V | | True Food Kitchen | Server | Little Pine Restaurant | Server | Business Support Consultant | The Cheesecake Factory | Server |
| VI | No | AMS Global Winterfest | Seasonal Staff Member | Set and Ready Services | Merchandising Specialist | Underwriter | CVS Health | Customer Care Rep |
| VII | | Mary Webb-Tafoya | Office Manager | Village Inn | Hostess | Underwriter | - | - |
| VIII | | 5 Star Wedding & Events | Event Specialist | Sutera Spa | Receptionist | Credit Analyst | Happy Hours Yachting | Chief Yacht Stewardess |
| IX | No | Chick-Fil-A | Manager | Hampton Tedder Electric | Planner | Business Support Analyst | The Whisper House | Server/ Barback/ Host |
| X | | - | - | Azusa Pacific Undergrad Enrollment Services | Peer Educator | Small Business Loan Specialist | Children Youth and Family Collab. | Youth Education Specialist |
| XI | No | - | - | NBR | Telemarketer | Business Analyst, Underwriter | - | - |

58.     Given the limited experience and qualifications of Lendistry employees, combined with the frantic pace at which employees were required to process applications, Relator alleges, on information and belief, that Lendistry did not (i) confirm the receipt of borrower certifications contained in the PPP application, (ii) confirm the receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll

30

taxes, (iii) confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation, and (iv) follow applicable Bank Secrecy Act requirements, as the PPP rules required. *See* 85 Fed. Reg. at 20815.

## Count I: False or Fraudulent Claims
### (31 U.S.C. § 3729(a)(1)(A))

59.    Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

60.    During the period from March 27, 2020, through the present, Lendistry knowingly presented, or caused the presentation of, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). These false or fraudulent claims included: (1) fraudulent PPP loan applications that Lendistry knowingly approved; (2) fraudulent PPP loan guarantee requests to SBA; (3) applications by borrowers to SBA for forgiveness of PPP loans that were issued based on fraudulent loan applications that Lendistry knowingly approved; and (4) claims by Lendistry to SBA for processing fees on PPP loans that Lendistry knowingly originated based on fraudulent loan applications.

61.    By virtue of the false or fraudulent claims Lendistry knowingly presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count II: False Records and Statements
### (31 U.S.C. § 3729(a)(1)(B))

62.    Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

63.    During the period from March 27, 2020, through the present, Lendistry knowingly made, used, or caused to be made or used false records or statements – including fraudulent PPP

loan applications, SBA Forms 2484 for guarantees of PPP loans that Lendistry knowingly originated based on fraudulent loan applications, applications by borrowers to SBA for forgiveness of PPP loans that were issued based on fraudulent loan applications, and SBA Forms 1502 for processing fees on PPP loans that Lendistry knowingly originated based on fraudulent loan applications – material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

64.    By virtue of the false records or statements Lendistry made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Prayer for Relief

WHEREFORE, Relator demands and prays for the following relief:

1.    That judgment be entered in favor of the United States for the amount of its damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

3.    An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

4.    An award to Relator of its costs and reasonable attorneys' fees for prosecuting this action; and

5.    All other relief as may be required or authorized by law and in the interests of justice.

## Demand for Jury Trial

Relator hereby demands a trial by jury.

Dated: October 30, 2024                Respectfully submitted,

INTEGRA RESEARCH GROUP LLC

By its attorney

Gregg Shapiro (BBO No. 642069)
Gregg Shapiro Law, LLC
101 Federal Street, Suite 1900
Boston, MA 02110
Tel: 617-582-3875
gshapiro@greggshapirolaw.com